THE CITY OF LANSING v. EUGENE B. WOOD, ORLANDO M.
BARNES, MARTIN HUDSON, EBEN W. DART, SCHUYLER
S. OLDS, JOHN W. EDMUNDS, WESLEY EMERY
AND EUGENE ANGELL.

57  201
119  661

*City treasurer—Transfer of funds to successor—Ratification of irregularity.*

1. The charter of Lansing gives the common council full power to settle with the city treasurer when he leaves office. An outgoing treasurer accounted for the funds by giving certificates of deposit, but the bank which issued them failed and the money was lost. *Held*, in an action against his bondsmen, that they were entitled to show that the council had ratified the treasurer's action, if that was irregular.

2. The school funds of Lansing are left in the keeping of the city treasurer and are to be paid out by him to the treasurer of the board of education "on the order of said board." (Charter, tit. xv. § 4). Whether payment without the order of the board is valid—Q.

3. Whether public funds can be transferred by a public treasurer to his successor by giving certificates of deposit—Q.

Error to Ingham. (Gridley, J.) Jan. 8.—June 10.

DEBT. Defendants bring error. Reversed.

*John C. Shields, Henry P. Henderson, Isaac P. Christiancy* and *Orlando M. Barnes* for appellants. Whether a fiscal officer cannot transfer funds to his successor by certificates of deposit (*Eyles v. Ellis* 4 Bing. 112; 2 Pars. Cont. 625) which have the same effect, though expressly payable *in current funds*, as though not made so, if there is no evidence that any medium of payment is meant that is not as good as gold: *Phœnix Ins. Co. v. Allen* 11 Mich. 501; *Phœnix Co. v. Gray* 13 Mich. 191; *Phelps v. Town* 14 Mich. 374; see *Strong v. Hart* 6 B. & C. 160; *Vernon v. Boveric* 2 Show. 296; *Guardians, &c. v. Greene* 1 H. & N. 884; *Eyles v. Ellis* 4 Bing. 112; *Camidge v. Allenby* 6 B. & C. 373; *Booth v. Smith* 3 Wend. 66; 2 Pars. N. & B. 160; by the neglect to present the certificates in due time for payment at the bank, the incoming treasurer makes them his own or the property of the city, and from that time, at least, they operate as payment and he and his sureties are discharged: and this is so whether the certificates

were received as actual or only conditional payment, or as collateral security, though the evidence shows they were received in payment: *Jennison v. Parker* 7 Mich. 355; *Whitten v. Wright* 34 Mich. 92; *Blanchard v. Booming Co.* 40 Mich. 568 (same rule even as to counterfeit paper not returned in time); *Atwood v. Cornwall* 28 Mich. 336; *Gloucester Bank v. Salem Bank* 17 Mass. 33; *Perley v. Muskegon County* 32 Mich. 132; sureties on official bonds are discharged if injured by any act of the obligee: Brandt on Suretyship §§ 79, 384, 390; *Pattison v. Guardians* 1 H. & N. 523; *Merch. Nat. Bank v. Samuel* 20 Fed. Rep. 664; *Justices v. Fennimore* 1 Coxe (N. J.) 242; the right of public officers to receive commercial paper as money and make themselves chargeable with it has repeatedly been held in this State: *Heald v. Bennett* 1 Doug. (Mich.) 513; *Welch v. Frost* 1 Mich. 30; *People v. Com. Land Office* 19 Mich. 470; *Jones v. Wright* 34 Mich. 371.

*A. F. Rouse* and *Isaac Marston* for appellee.

CHAMPLIN, J. I am of opinion that a new trial should be awarded in this case, for the reasons following:

1. *As to the moneys claimed by the city, other than moneys belonging to the school fund.* The declaration is upon an official bond given by Wood, as city treasurer of the city of Lansing. The only breach alleged, under which a recovery can be had under the evidence, is the failure to pay over to his successor in office the money remaining in his hands as such treasurer.

Section 11 of title 4 of the charter of the city of Lansing, in addition to the powers especially conferred upon them thereby, confers upon the common council the power of management and control of the finances, rights and interests, buildings and all property, real and personal, belonging to the city. Local Acts 1875, p. 167. Section 29 makes it the duty of the common council to audit and settle with the city treasurer on the last Tuesday of April. Section 14 of title 5 (p. 179) makes it the duty of the treasurer to exhibit to the common council, at the last regular meeting in April, his account, and the state of the treasury, which account shall be referred to

a committee for examination; and, if found correct, it shall be filed and published.

This account was exhibited by defendant Wood, and was referred to a committee, who reported to the council that they found it correct. The same day Wood turned over to his successor in office certain certificates of deposit, which his successor received as a payment of the city funds to him. It is claimed that he had no authority to receive such certificates as payments, and that he is liable nevertheless to the city as for a breach of his bond. The defense offered testimony tending to show that the act of Wood in delivering to his successor, and the act of his successor in receiving such certificates as money, was ratified by the common council. This testimony was rejected by the court.

I think it was competent to show ratification by the common council, in view of the extensive powers the charter clothes them with over the finances and property of the city. In my opinion it was error to exclude the testimony offered tending to prove ratification.

2. *As to the school moneys.* The charter provides that the treasurer of the city shall collect the money, and keep all school funds belonging to the city separate from all other funds, and he shall pay over to the treasurer of the school board all moneys on the order of said board. Sec. 4, tit. 15. The law also provides that the school board shall hold and control all moneys, etc., belonging to the school district. The law does not specify by whom the order on the treasurer shall be signed, but it provides that the board shall elect a president, clerk, and treasurer. They shall keep a record of their proceedings, which shall be signed by the president and clerk. Doubtless money drawn from the city treasurer to be paid to the treasurer of the board would require a vote of the board; and a written order, in pursuance thereof, signed by its president, would be sufficient.

Now the plaintiff claims that before the expiration of the term of office for which Wood was elected, he had in his hands belonging to the school fund $12,000 that he has never paid over to the treasurer of the school board on the order

of that board, nor has he paid it to his successor in office. Defendants claim that prior to the expiration of his term he paid to the treasurer of the board, at his request, $12,000, in certificates of deposit on the banking house of E. Angell, and took the treasurer's receipt, which he turned over to, and which was accepted by, the committee of the council, who settled with him on that basis.

It is clear to my mind that the charter makes the city, by its treasurer, simply a custodian of the school fund for the benefit of the board of education. The law directs this fund to be kept separate from the other funds, and does not make it subject to be drawn by warrant by the city authorities. It is not subject to their control in any respect. The treasurer is chargeable with it, and is liable on his bond if he fails to pay it over on the order of the board, or to his successor. The vital question here is whether he has paid it over to the treasurer of the board so as to exonerate him from liability on his bond to the city. I agree with my brother Campbell that a payment to the treasurer of the school board on his request, without an order of the school board, does not exonerate him from liability. But I think a subsequent ratification by the board of the transfer is equally good as an order originally given.

I reserve my opinion upon the other questions involved. Upon those I have mentioned I think the circuit judge erred in not submitting them to the jury, and I therefore concur with the Chief Justice in the result he has reached.

COOLEY, C. J. In the opinion of my brother Champlin, so far as concerns the right of the defendants to show that the act of Wood in delivering to his successor, and the act of the successor in receiving certain certificates of deposit had been ratified by the common council, I concur.

As to the moneys belonging to the school fund, it appears that they were accounted for by Wood to the treasurer of the board of education, and, by consent of the latter, the banking house of Eugene Angell issued to him certificates of deposit therefor. This banking house was at the time in

good repute, and the evidence is that the certificates, if then presented for payment, would have been paid. The treasurer of the board of education had authority to deposit the school moneys in bank, and the certificates which were issued were payable to his order. Mr. Wood from that time had no control over them, or over the moneys they purported to represent. Whatever special arrangement was made at the time in regard to the payment of the certificates was made with the concurrence of the treasurer of the board, and if he was entitled to receive the funds, it must be regarded as his own arrangement.

The reasons assigned for still holding Wood and his sureties responsible for this fund are: *First*, that payment by him could lawfully be made in nothing but money; and *second*, that by the city charter moneys are to be transferred from the city treasurer to the treasurer of the board of education on the order of that board. The first reason has to my mind no application to this case; for the transaction with the treasurer of the board was such as to amount to a deposit by himself of the amount he receipted to Wood. If Wood had first drawn the money from the bank, and Edmunds had taken and immediately deposited it, the latter, unquestionably, if he had a right to the moneys, would have taken upon himself all risks. What difference it can make that the parties did not count out the money and then count it in again, I do not perceive. It is manifest that all parties at the time understood that the fund had been transferred to Edmunds, and it is certain that he had all the evidences of right, and the complete and absolute control.

That the board of education took no action for the transfer of the fund seems to me unimportant. The treasurer of that board being legal custodian, a formal order for the transfer was only essential for the purpose of compelling it. If the city treasurer makes the transfer voluntarily, it seems to me equally effectual; the statute only contemplating that it shall pass through his hands to the proper custodian. Besides there is strong evidence in the case that what was done was

subsequently recognized as proper by the official boards, so that a question of ratification was fairly presented.

I agree that there should be a new trial.

SHERWOOD, J. concurred.

CAMPBELL, J.   Suit was brought and recovery had below on the official bond of defendant Wood, as city treasurer of Lansing, the other defendants being his sureties.   The defalcation was in failing to pay over moneys received during his official term, which came to an end May 7, 1883.   The principal sums which were received, with interest, included $12,000 of school moneys and $6700 of general funds.

The school funds of Lansing belong to the board of education, but are collected by the city; and by the city charter it is provided (title 15, § 4) that "the treasurer of said city shall collect the money, and keep all school funds belonging to said city separate from all other funds, and he shall pay over to the treasurer of said board all moneys on the order of said board; he shall report to the board the condition of the school fund whenever requested by them."

So far as this school money is concerned, the liability is disputed on the ground that three days before the end of his term of office, and on May 4, 1883, Wood paid over the $12,000 in question to the treasurer of the school board, by turning over to him four certificates of deposit for $3000 each, signed by Eugene Angell, and payable to J. W. Edmunds, treasurer, with interest at four per cent.   Angell (who, as well as Edmunds, is one of Wood's bondsmen, here made defendants) had a private banking office at Lansing until May 15, 1883, when he suspended payment, and his affairs were put into the hands of a receiver shortly after.

The remaining portion of the deficiency is also claimed to have been paid by turning over to Wood's successor in office various certificates of deposit, made to Wood's order, and indorsed over.   In both cases the officers gave receipts as for cash.

The court below held that neither of these alleged arrange-

ments discharged Wood, and held further that such a transfer was not a payment that could lawfully be received, as against the corporation, by its officers; and that, as the paper was not realized upon, it did not discharge Wood or his sureties.

It was urged below and here, that the payment to Edmunds had been ratified by the board of education by suit brought on the certificates against Angell. And it was further urged that the arrangements made by the various city authorities at the time of Wood's leaving office estopped the city from any further claim. Reliance was also had upon the payments as good independently.

So far as the Edmunds payment is concerned, it possesses some features making it differ seriously from the other, and, so far as that difference goes, it may be properly dealt with by itself.

The board of education of Lansing has jurisdiction over the schools of the whole city as one district, and is authorized by section 1, tit. 15, to "hold and control all moneys," belonging to the district and expend the same solely for the benefit of the schools. The proceedings of this board are required to be recorded, and the record signed by president and clerk. Section 2. The board is required and empowered to " apply for, and receive from the county or city treasurer or other officers, all moneys appropriated or belonging to the primary school funds of said city," etc., and to expend them according to law. Section 3. Their own treasurer is required to be elected from their own number (section 2), and is to give bonds with good and sufficient sureties for at least double the amount of money intrusted to his hands. Section 6. As already pointed out, the city treasurer is to keep the school moneys separate from all others, and pay them over to the treasurer of the board on the " order of said board." Section 4.

It is not, therefore, within the power of the city treasurer to pay, nor within the right of the school treasurer to receive, school moneys, until the school board' wish and order the transfer. In the present case the money in question was not for current school purposes, but was a special building

fund, which was not needed for immediate disbursement, and which the board may, for reasons of their own, have preferred to leave in the city treasury until needed. It does not appear whether the school treasurer's bond had been made to cover this fund. We need not inquire why the school board did not withdraw the fund from the city treasurer. The charter is express that it can only be done by the "*order of said board*," and no such order was given. The transfer was one forbidden by law, and Wood and Edmunds were bound to know it.

These provisions, inserted in the charter of Lansing by the Legislature, are not left to be followed or not, as the local officers may choose. The public moneys raised by taxation are needed for the purposes for which they are collected, and the law intends that they shall be safely guarded for that purpose. It is not optional with the corporate officers to use and invest them as they please. Every one handling what he knows to be a fund protected by law must obey the law.

Assuming, what we do not intimate to be true, that the board of education could accept dishonored paper in lieu of the public money which they were required to look after and expend, the case presents nothing to show any such corporate action by the board. No officer of the board could waive or destroy the rights or duties of the board itself, and the fact that an attachment was sued out on the certificates of deposit, in the name of the board of education by one or more of its officers, without instruction from the board, could have no effect by way of acceptance and ratification. The board is the only body that could order the transfer of funds from the city treasury, and if a previous transaction of the nature of that now in question could be ratified, the board, and only the board, could adopt it.

The $12,000 referred to cannot be treated as an authorized payment by Wood to Edmunds, either as lawful when made, or as made good by adoption. If the money had been realized and used for board purposes, a very different case would be presented. Here the certificates were neither

more nor less than Angell's personal obligations, which were never cashed, and were on the same footing as any other dishonored paper. This fund was clearly in default.

The remaining questions relate to the acceptance by Mr. Bradley, Wood's successor, of certificates of deposit, purporting to be issued by Angell in Wood's favor, and indorsed over.

At the close of Wood's term the amount of city funds in his hands was reported by the special committee appointed to examine into the clerk's and treasurer's accounts as $36,944.20, and this balance he ostensibly turned over to Mr. Bradley, his successor, in cash and other assets, which Mr. Bradley receipted for, generally as cash, to that amount. Included in these assets were about $10,000 of Angell's certificates, of which something over $7000 was in certificates dated May 7, 1883, which was the day of settlement. Bradley supposed this paper to be good. Of these last certificates and earlier ones, Bradley realized on presentation all but three certificates. These, amounting to $6700, were presented to Angell on May 15, 1883, the day before he stopped payment, and he refused payment on the ground that they were issued in his absence, without authority. The testimony upon this subject indicated, without contradiction, that on May 7th certificates to the amount of $7400 were issued to Wood as a loan, to enable him to make up deficiencies in his city accounts, and did not represent funds belonging to him, on which Angell was his debtor, but was accommodation paper, whether authorized or unauthorized.

The question now before us is whether the court below erred in not holding that Bradley's receipting for this as cash operated to bind the city as against Wood, and compel the city to treat these certificates as money paid over by Wood in discharge of himself and his sureties.

There is no principle of law which can make a negotiable certificate of deposit stand as evidence that the banker and the payee occupy the relative positions of depositor and bailee. A deposit in a bank, while it makes the bank owner of the funds, and debtor to the depositor, neverthe-

less involves an understanding that the bank will honor such checks as may be drawn against the deposit, and that the money will be drawn in that way, and the fund will be kept good until drawn. Under some bank charters and banking laws, the responsibility of banks and their officers and stockholders to depositors is specially regulated. But a certificate of deposit is neither more nor less than an ordinary promissory note, to be paid on presentation, like any other note, to any one who may become the holder, and is totally different from a deposit account, which no one but the depositor can withdraw. It negatives the idea that the amount which it represents is a fund on deposit belonging to any one as depositor. We have had occasion several times to construe the legal effect of such certificates, and such has been the expression of our views. *Cate v. Patterson* 25 Mich. 191; *Tripp v. Curtenius* 36 Mich. 494; *Burrows v. Bangs* 34 Mich. 304. See also *Downey v. Hicks* 14 How. 340. Such a certificate is no payment unless received as such by one who has power to accept payment in that way.

The question is not, perhaps, of any great importance, except in the one point of view urged on the argument that Wood had lawfully deposited his official moneys in Angell's bank, and by this process merely shifted the deposit to his successor, who thereby made the same bank his own place of deposit.

No authority is found in our reports, and so far as we have discovered, none exists anywhere, which favors the idea that a public treasurer may accept from a public debtor payment in anything but money. If he takes anything else, he may make himself liable for any harm that may come from his doing so, but until the money is actually realized, the debtor has made no payment which will bind the creditor. If the money is realized the payment then becomes complete, but not otherwise. *Jones v. Wright* 34 Mich. 371; *People v. Commissioner of Land Office* 19 Mich 481; *Bank of Orange v. Wakeman* 1 Cow. 46; *Mumford v. Armstrong* 4 Cow. 553; *Welch v. Frost* 1 Mich. 33; *Heald v. Bennett* 1 Doug. (Mich.) 513; *Woodbury v. Lewis* Walk. Ch. 256;

*People v. McKinney* 10 Mich. 99; *Elliott v. Miller* 8 Mich. 132.

Even assuming that the transaction had been a transfer of deposits, it could not be treated as a payment to the city, unless authorized by the city. Money deposited with a banker is merely so much lent to the banker, and becomes his money, subject only to his personal liability to respond. This doctrine is familiar. *Sims v. Bond* 2 N. & M. 608. General deposits differ from special deposits in this main par-ticular, that they create debts instead of bailments. *Marine Bank v. Fulton Bank* 2 Wall. 256; *Thompson v. Riggs* 5 Wall. 663; *Planter's Bank v. Union Bank* 16 Wall. 483; *Oulton v. Savings Inst.* 17 Wall. 109.

Upon this principle we held, in *Perley v. Muskegon* 32 Mich. 132, that where the bank in which a treasurer makes a deposit is not one which is determined by law as a public agency for deposit, the money which he deposits there is at his own risk and is not a public bailment, and becomes a private debt from the banker to him, whatever may be the responsibility of the bankers if they should collude with him in any fraud.

But it does not follow from this that such an officer becomes, as to the public, the absolute owner of the funds in his hands, so that no one can question the use he makes of them. On the contrary, it was held in *People v. McKinney* 10 Mich. 54, and in *People v. Bringard* 39 Mich. 22, that a public trust fund does not lose its character by changing the specific moneys which make it up, and in the latter case the duty of the officer to keep such moneys entirely separate from his own was fully recognized. Under the charter of Lansing this duty is expressly declared by title 5, § 15, which requires the city treasurer to keep all moneys in his hands belonging to the city separate and distinct from his own moneys; and he is thereby prohibited from using, either directly or indirectly, the city money or funds, or any of the school or library funds, for his own use or benefit, or that of any other person. These provisions mark out his duty clearly, and exclude the idea advanced on the hearing that

these funds can be regarded for any purpose as his private moneys. The rule that he must account for them absolutely is one which has always prevailed, except where some legal place of deposit is provided; and if he places them outside of his personal custody, the bailee or custodian is his agent or debtor, and he cannot call on the city to accept that person as responsible and discharge himself.

There is nothing in the record to indicate any consent by the city to substitute any public or private bank as custodian. The charter does not allow public money to be lent on negotiable paper, or in any other way. But it does provide by title 16, § 8, that the common council shall have power to contract with any safe banks or bankers for the safe keeping of public moneys, and the payment of interest upon such moneys deposited with them "to be drawn on account current" from such banks or bankers, and to provide proper rules and conditions for letting such contracts and drawing such moneys, and the securities to be given for the moneys so deposited. This does not contemplate depositing money without adequate security, or beyond the usual course of drawing out. And it is, at least, questionable whether the council could, under this section, place money where it would be beyond the protection of the treasurer's bond without taking security from the bank or banker holding it on deposit.

Whatever deposits were made by Wood, or whatever other use he made of the city money, there is nothing in the case tending to show that it was ever at the risk of the city, and the city officers could not discharge Wood without actual payment.

The balance represented by the unpaid certificates was therefore properly treated as never lawfully discharged, and defendants were properly held for this, as well as for the school moneys.